IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| vs. | ) ) ) | JURY TRIAL DEMANDED |
| THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); AGC CHEMICALS AMERICAS, INC.; AMEREX CORPORATION; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS, INC.; CHEMOURS COMPANY FC, LLC; CHEMOURS FC; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; DUPONT DE NEMOURS, INC. (f/k/a DOWDUPONT, INC.); DYNEON LLC; E.I. DUPONT DE NEMOURS AND COMPANY; JOHNSON CONTROLS, INC.; NATION FORD CHEMICAL COMPANY; PERIMETER SOLUTIONS, LP; THE ANSUL COMPANY; THE CHEMOURS COMPANY; TYCO FIRE PRODUCTS LP; WILLIAMS FIRE & HAZARD CONTROL; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## <u>COMPLAINT</u>

Plaintiff Miccosukee Tribe of Indians of Florida, by and through its undersigned counsel,

for its Complaint against Defendants alleges as follows:

## INTRODUCTION

1.      Miccosukee Tribe of Indians of Florida ("Plaintiff," "Tribe" or "Miccosukee Tribe") is a federally-recognized sovereign Indian tribe that maintains a government-to-government relationship with the United States and whose governing body is recognized by the Secretary of the Interior. *See* Indian Entities Recognized By and Eligible to Receive Services From the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5464 (Jan. 30, 2020).

2.      The Tribe has depended on natural rivers, lakes and streams to sustain the life of its members for centuries. Now, these Tribal waters and indigenous fish are contaminated with manmade "forever chemicals" known to cause cancer and other diseases, threatening the health, welfare and rights of the Tribe. The Tribe, in its sovereign capacity, brings this action against Defendants, the manufacturers and distributors of these chemicals and/or products containing or resulting in these chemicals, jointly and severally to protect the Tribe's health, safety, and welfare, and to restore the natural environment of its lands and waters and protect its rights.

3.      Specifically, Plaintiff brings this action for the costs required to remediate the presence of Polyfluoroalkyl substances of "PFAS" chemicals – including, but not limited to, Perfluorooctanoic acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorhexanoic acid ("PFHxA"), Perfluoropentanoic acid ("PEPA"), Perfluoroheptanoic acid ("PFHpA"), Pentafluorobenzoic acid ("PFBA"), Perfluorobutanesulfonic acid ("PFBS"), Perfluorononanoic acid ("PFNA"), Perfluorodecacanoic acid ("PFDA"), and Perfluorohexane Sulfonic Acid ("PFHS"), as well as any and all hazardous chemicals produced by Defendants (collectively referred to herein as "PFAS"), -- found in the Tribe's waters, flora, aquatic life, fauna, and land.

2

4.    Defendants manufactured, marketed, and sold aqueous film-forming foam ("AFFF"), a firefighting product used to control and extinguish aviation, marine, fuel, and other flammable liquid fires ("the AFFF Products").

5.    Defendants' AFFF Products contained per- and poly-fluoroalkyl substances ("PFAS") – chemicals that Defendants have known for decades would contaminate natural water sources and, likewise, cause adverse health, environmental, and cultural effects of the Tribe.

6.    PFAS chemicals that seep into the soil and water are dangerous because they are mobile, persist in the environment, bioaccumulate in individual organisms, aquatic life, and humans, and bio magnify up the food chain.  Once PFAS chemicals get into the environment, water, soil, aquatic life, mammals, and/or humans, the PFAS chemicals remain forever, hence their common name of "forever chemicals."

7.    PFAS chemicals are associated with significant adverse health effects in humans, including but not limited, to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

8.    Defendants were aware since the 1960s and the 1970s that PFAS are toxic, do not biodegrade, are persistent in the environment, move easily through soil and groundwater, and pose a significant risk to human health and safety.  Yet Defendants elected to manufacture and sell products utilizing these chemicals without warning the public or government entities and placing profits over public health and safety. Defendants elected to include PFAS in their AFFF products despite knowing these chemicals were dangerous and unnecessary.

9.    Defendants designed, manufactured, marketed, distributed, and/or sold AFFF Products knowing that the PFAS in these Products would be released into the environment during fire protection, training, and response activities, even when used as directed and intended

3

by Defendants. Despite their knowledge, Defendants kept this information hidden from the public, including the Tribe.

10. Civilian and military airports, fire departments, industrial facilities, and military bases used AFFF Products containing PFAS for decades for firefighting and training, unaware of the environmental and health risk and hazards of using Defendants' AFFF Products.

11. These sites throughout the country have been linked to contamination of surface and groundwater, as well as drinking water wells, with PFAS. The Tribe's Indian Lands are the latest example, due to the widespread contamination and pollution.

12. The PFAS Defendants used in their Products has seeped into the groundwater and surface water and into a flow zone on and/or adjacent to the Tribe's Indian Lands, contaminating the water wells on the Tribe's Indian Lands, other waters in the vicinity and the air.

13. In October 2025, Florida International University and the Tribe announced toxic PFAS contamination found PFAS in ground and/or surface water on the Tribe's Indian Lands.

14. As a result of the contamination caused by Defendants' AFFF Products, the Plaintiff has or will have to engage in testing to try to determine the extent of the contamination, to retain consulting experts to discuss remediation, incur costs of purchasing bottled water and face additional substantial costs and future expenses for remediation and medical monitoring. The Tribe's cultural practices will also suffer.

15. Defendants' AFFF Products have created an unreasonable danger to public health and safety on the Tribe's Indian Lands and to its residents. This condition must be remediated to protect the health and welfare of tribal members and to preserve culturally important social dynamics within the Tribe.

16.     As a result of the contamination caused by the Defendants, Plaintiff has had to respond proactively to protect the health and welfare of the Tribe.  The Tribe is bringing this action to recover costs associated with remediation of PFAS chemicals in Tribal ground and surface water, costs associated with treating drinking water contaminated with PFAS, soil remediation, restoration of tribal fisheries, conduct of proper studies, and medical monitoring of tribal members for injuries associated with PFAS exposure.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, insofar as the parties are completely diverse and the amount-in-controversy exceeds $75,000, excluding interest and cost.  This Court also has subject matter under 28 U.S.C. § 1331, as Plaintiff brings a federal cause of action that raises federal question jurisdiction and, even if diversity jurisdiction were absent rather than present, this Court would still have supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     Plaintiff brings this civil action directly in *In Re: Aqueous Film-Forming Foams Products Liability Litigation*, Multi-District Litigation ("MDL") No. 2873.  Plaintiff files directly in this venue, the United States District Court for the District of South Carolina, Charleston Division, as allowed under the provisions of Paragraphs 25 - 29 of this Court's Case Management Order No. 3, dated April 26, 2019 (Doc. # 72).  Plaintiff designates the United States District Court for the Southern District of Florida as its "Home Venue" under 28 U.S.C. § 1391 because the Tribe's Indian Lands are located in that District and a substantial part of the events giving rise to this Complaint occurred in that District.  But for this Court's Order permitting direct filing in this MDL, Plaintiff would have filed in its Home Venue.

**PARTIES**

a.    **Plaintiff**

19.    The Plaintiff, Miccosukee Tribe of Indians of Florida, is a federally recognized sovereign Indian tribe with approximately 640 tribal members.  The Tribe is governed by the organic documents and laws of the Tribe and certain treaties, with its Indian Lands located within the boundaries of Broward and Miami-Dade Counties, Florida.  The Tribe exercises inherent sovereign governmental authority within its Indian Lands and on behalf of the health and welfare of the Tribe and its members ("Tribal Members"), descendant children and grandchildren, and other inhabitants of the Tribe's Indian Lands.  Members of the Tribe are affected by the actions and conduct of the Defendants both directed at or near the Tribe's Indian Lands, as well as areas outside of the Tribe's Indian Lands.  Tribal Members live both on and off of the Tribe's Indian Lands.

20.    This action is brought by the Tribe in the exercise of its authority as a sovereign government on behalf of the Tribe in its proprietary capacity and under the Tribe's *parens patriae* authority in the public interest to protect the health, safety, and welfare of all Tribe Members as well as the non-Tribal Member inhabitants of its Indian Lands. The Tribe also brings this action to recover damages and seek other redress for harm caused by Defendants' negligence, gross negligence, trespass, nuisance, and fraudulent transfer relating to PFAS. Defendants' actions have caused and continue to cause damages that threaten the health, safety, and welfare of the Tribe.

b.    **Defendants**

21.    The term "Defendants" refers to all Defendants named herein jointly and severally.

i.    The AFFF Defendants

22.     The term "AFFF Defendants" refers collectively to Defendants 3M Company, Amerex Corporation, Buckeye Fire Equipment Company, Chemguard Inc., The Ansul Company and Tyco Fire Products L.P.

23.     Defendant 3M Company, f/k/a Minnesota Mining and Manufacturing Company, ("3M"), is a Delaware corporation and does business throughout the United States. 3M has its principal place of business at 3M Center, St. Paul, Minnesota 55133.  3M began producing PFOS and PFOA by electrochemical fluorination in the 1940s.  In the 1960s, 3M used its fluorination process to develop AFFF.  3M manufactured, marketed, and sold AFFF from the 1960s to the early 2000s.  In 2000, 3M announced it was phasing out its manufacture of PFOS, PFOA, and related products, including AFFF.  3M, in its press release announcing the phase out, stated "our products are safe," and that 3M's decision was "based on [its] principles of responsible environment management."  3M further stated that "the presence of these materials at very low levels does not pose a human health or environmental risk."  In communications with the EPA at that time, 3M also stated that it had "concluded that…other business opportunities were more deserving of the company's energies and attention…"

24.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

25.     Amerex designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint.  Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted,

7

sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

26.     In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

27.     Upon information and belief, beginning in 2011, Amerex designed, manufactured, marketed, distributed, and sold AFFF containing PFAS.

28.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

29.     Buckeye designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint.  Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

30.     Defendants Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, La Crosse, Wisconsin 54143.

31.     Beginning in the 1990s, Chemguard designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed,

marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

32.     Upon information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.  Both Tyco and Chemguard, upon information and belief, are controlled by Johnson Controls PLC, an Irish PLC, by and through a succession of shell companies and entities, partly in an attempt to shield Johnson Controls PLC from AFFF-related liabilities.  Plaintiff reserves the right to amend its complaint to add these defendants upon necessary discovery.

33.     Defendant Johnson Controls, Inc. ("Johnson Controls") is a Wisconsin corporation and does business throughout the United States. Johnson Controls has its principal place of business in Milwaukee, Wisconsin.

34.     Johnson Controls designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

35.     Defendant Tyco Fire Products, LP, as successor-in-interest to The Ansul Company ("Tyco"), is a Delaware limited partnership and does business throughout the United States.  Tyco has its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19466. Tyco manufactured and currently manufactures the Ansul brand of products, including Ansul brand AFFF containing PFAS.

9

36.     Tyco is the successor in interest to the corporation formerly known as The Ansul Company ("Ansul"). At all times relevant, Tyco/Ansul designed, marketed, developed, manufactured, distributed released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

37.     Defendant The Ansul Company ("Ansul") is a Wisconsin corporation, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Ansul does and/or has done business throughout the United States, including conducting business in Florida. This Defendant manufactured and sold AFFF that contained PFOA.

38.     Beginning many decades ago, Ansul designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

39.     Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS.

40.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS.

10

ii.    The Fluorosurfactant Defendants

41.    The term "Fluorosurfactant Defendants" refers to Defendants 3M, Arkema, Inc., BASF Corporation, ChemDesign Products Incorporated, Chemguard Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC and DuPont de Nemours Inc.

42.    Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation and does business throughout the United States. Arkema has its principal place of business at 900 First Avenue, King of Prussia, Pennsylvania 19406. Upon information and belief, assets of Arkema's fluorochemical business were purchased by defendant Dupont in 2002. Upon information and belief, Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

43.    Arkema, Inc. develops specialty chemicals and polymers. Upon information and belief, Arkema, Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products. Arkema designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

44.    Defendant BASF Corporation ("BASF") is a Delaware corporation and does business throughout the United States. BASF has its principal place of business at 100 Park

11

Avenue, Florham Park, New Jersey 07932.  Upon information and belief, BASF is the successor in interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation).

45.    BASF designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint.  Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

46.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation and does business throughout the United States. ChemDesign has its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

47.    Upon information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.  ChemDesign designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint.  Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

48.     Defendant The Chemours Company ("Chemours Co.") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware 19899.

49.     Defendant Chemours Company FC, LLC ("Chemours FC"), is a Delaware corporation and does business throughout the United States.  Chemours has its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.  Chemours FC is a subsidiary of The Chemours Company.

50.     Defendant The Chemours Company ("Chemours"), is a Delaware corporation and does business throughout the United States. Chemours has its principal place of business 1007 Market Street, Wilmington, Delaware 19898. Upon information and belief, Chemours was spun off from DuPont in 2015 to assume PFAS related liabilities.

51.     Chemours designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

52.     Upon information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015.  From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

53.     In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFAS and fluorosurfactants. Upon information and belief, Chemours Co. has supplied

fluorosurfactants containing PFAS and/or their chemical precursors to manufacturers of AFFF products.

54.    In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly traded company.

55.    Defendant The Chemours Company FS, LLC ("Chemours FC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

56.    Chemours FC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

57.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation and does business throughout the United States.  Deepwater's principal place of business is at 196122 E County Road 735, Woodward, Oklahoma 73801.

58.    Upon information and belief, Deepwater designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.  Deepwater designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response

14

exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

59.     Defendant Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("DowDuPont") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.  DowDupont was created in 2015 to transfer Chemours and DuPont liabilities for manufacturing and distributing flurosurfactants to AFFF manufacturers.  On June 1, 2019, DowDuPont separated its agriculture business through its spin-off of Corteva.

60.     DowDuPont designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

61.     Defendant E.I. Du Pont de Nemours & Company ("DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  Defendants E.I. DuPont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this complaint.

62.     Upon information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use

15

in AFFF products.  DuPont designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

63.    Defendant Corteva, Inc. ("Corteva) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  It is successor-in-interest to Dupont Chemical Solutions Enterprise.  Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

64.    Corteva was initially formed in February of 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.  On June 1, 2019, DowDuPont distributed to its stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E.I. Du Pont de Nemours & Company.

65.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva.

66.    Corteva designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF

containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

67.    Upon information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products.

68.    Upon information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at airports and military bases around the country.

iii.    The PFC Defendants

69.    The term "PFC Defendants" refers collectively to 3M, AGC Chemicals Americas Inc., Archroma Management, LLC, ChemDesign Products, Inc., Chemicals, Inc., Clariant Corporation, Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., and Nation Ford Chemical Company.

70.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

17

71. Upon information and belief, AGC was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405, Japan.

72. AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

73. Upon information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products. AGC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

74. Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, Texas 77520.

75. Upon information and belief, Chemicals, Inc. supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products. Chemicals designed, marketed, developed, manufactured, distributed, released, trained us4ers, produced instructional materials, promoted, sold and/or otherwise handled and/or used

AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

76.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, South Carolina 29715.

77.    Upon information and belief, Nation Ford supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

78.    Upon information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

79.    Upon information and belief, the Fluorochemical Defendants supplied PFCs containing PFAS and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at military bases around the country.

iv.    <u>Additional Defendants</u>  **[combine into one of the above categories instead?]**

80.    Defendant Daikin America, Inc. is a Delaware corporation and does business throughout the United States.  Its principal place of business is in Orangeburg, New York.

81.    Daikin designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which

are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

82.     Defendant Dyneon LLC is a unit of 3M with its principal place of business at 6744 33rd Street in Oakdale, Minnesota, 55218.

83.     Upon information and belief, Dyneon LLC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used AFFF containing PFAS used in firefighting training and response exercises which are the subject of this Complaint.  Further, defendant Dyneon LLC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

84.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina company and does business throughout the United States. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

85.     Nation Ford designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

20

86.     Defendant Perimeter Solutions, LP ("Perimeter") is a Delaware corporation and does business throughout the United States.  Perimeter has its principal place of business in Rancho Cucamonga, California.

87.     Perimeter designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are used in firefighting training and response exercises which are the subject of this Complaint. Further, defendant designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

88.     Defendant Williams Fire & Hazard Controls ("Williams"), upon information and belief, is a Texas corporation with its principal place of business at 9605 Richard Wycoff Dr, Port Arthur, Texas 77640. Upon information and belief, Williams is a subsidiary of Chemguard. Williams does and/or has done business throughout the United States, including conducting business in Florida. This Defendant manufactured and sold AFFF that contained PFOA.

89.     Williams designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint. Further, defendant designed, marketed, developed manufactured, distributed, released, trained users, produced instructional materials, promoted, sold and/or otherwise handled and/or used underlying chemicals and/or products added to AFFF which contained PFAS for use in firefighting.

90.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives

of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### a.    PFAS and Their Risk to Public Health

91.    PFAS are chemical compounds containing fluorine and carbon that are not naturally occurring and must be manufactured.

92.    PFAS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

93.    PFAS are mobile because they easily dissolve in water and spread in the environment, where they can readily contaminate soils and leach from the soil into groundwater and travel significant distances.

94.    PFAS are characterized by the presence of multiple carbon-fluorine bonds that make them thermally, chemically, and biologically stable; they resist degradation due to light, water, and biological processes.

95.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

96.     PFAS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time.  Because of this stability, any newly ingested PFAS will be added to any PFAS already present. In humans, PFAS remain in the body for years.

97.     PFAS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFAS.

98.     PFAS are persistent when released into the environment because their chemical structure makes them resistant to breakdown or environmental degradation.

99.     Exposure to PFAS is toxic and poses serious health risks to humans and animals.

100.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

**b.      Defendants' Manufacture and Sale of AFFF/Component Products**

101.    AFFF is a type of water-based foam first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

102.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

103.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants.  When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

104.    Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing PFAS or the chemical precursors that degrade into PFAS.

105.    AFFF can be made without the fluorosurfactants that contain PFAS and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFAS and/or their precursor chemicals into the environment.

106.    3M manufactured the fluorosurfactants in its AFFF products by 3M's patented process of electrochemical fluorination ("ECF").

107.    The fluorosurfactants used in other AFFF products sold by the AFFF Defendants were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

108.    The PFCs the Fluorosurfactant Defendants needed to manufacture those fluorosurfactants contained PFAS and/or their chemical precursors, and were designed, manufactured, marketed, distributed, and/or sold by the PFC Defendants.

109.    Upon information and belief, the PFC and Fluorosurfactant Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

110.    Upon information and belief, the PFC and Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the AFFF products discharged into the environment at military bases around the country during fire protection, training, and response activities, resulting in widespread PFAS contamination.

111.    Upon information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment at military

bases around the country during fire protection, training, and response activities, resulting in widespread PFAS contamination.

**c.    Defendants' Knowledge of the Threat to Public Health and the Environment Posed by PFAS**

112.    Upon information and belief, by at least the 1970s, 3M and DuPont knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

113.    Upon information and belief, 3M and DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFAS.

114.    Some or all of the Defendants knew and understood from their first sale to a customer that the fluorinated surfactants used in AFFF are stable when released into the environment, yet they failed to warn the public or provide reasonable instruction on how to manage wastes generated from those products.

i.    1940s and 1950s: Early Warnings About the Persistence of AFFF

115.    In 1947, 3M started its fluorochemical program, and within 4 years, it began selling its PFAS to DuPont. The persistence and contaminating nature of the fluorosurfactants contained in AFFF products were understood prior to the commercial application at 3M's Cottage Grove facility in Minnesota.

116.    The inventor of the 3M ECF process was J.H. Simons. Simons' 1948 patent for the ECF process reported that the PFCs are "non-corrosive, and of little chemical reactivity," and "do not react with any of the metals at ordinary temperatures and react only with more chemically reactive metals such as sodium, at elevated temperatures." Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at*

25

https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf (last accessed June 27, 2022).

117.    Simons further reported that fluorosurfactants produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural process in the environment. Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available at* https://www.ag.state.mn.us/Office/Cases/ 3M/docs/PTX/PTX3008.pdf (last accessed June 27, 2022).

118.    The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production. Simons' patent application further discloses that the fluorosurfactants produced in the ECF process were thermally stable at temperatures up to 750° C (1382° F). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds. Bryce, T. J., 1950. Fluorocarbons – Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

119.    Upon information and belief, nowhere in any Material Safety Data Sheet for any of Defendants' AFFF/Component Products is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFCs and fluorosurfactants used in AFFF products to consumers is a failure to warn just how indestructible the AFFF's ingredients are when released to unprotected water sources and even treatment plants.

      ii.   1960s: AFFF's Environmental Hazards Come into Focus

120.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including PFAS, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

121.    One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon." Bryce, H. G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964) *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/ PTX/PTX3022.pdf (last accessed June 27, 2022). Thus, 3M knew by the mid-1960s that its manufactured surfactants were immune to chemical and biological degradation in soils and groundwater.

122.    3M also knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the absorption and mobility of FC-95 and FC-143 (the ammonium salt of PFAS) in soils indicated very high solubility and very high mobility in soils for both compounds.  Technical Report Summary re: Absorption of FC 95 and FC 143 on Soil, Feb. 27, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/ PTX/PTX1158.pdf (last accessed July 27, 2022).

    iii. 1970s: Internal Studies Provide Evidence of Environmental and Health Risks

123.    By 1950, 3M knew that the PFAS used in its AFFF product(s) would not degrade when released into the environment but would remain intact and persist. Two decades later, in the 1970s – and after the establishment of a robust market of AFFFs using fluorosurfactants – 3M got around to looking at the environmental risks that fluorosurfactants posed.

27

124.    An internal memo from 3M in 1971 states that the "thesis there is 'no natural sink' for fluorocarbons obviously demands some attention." Memorandum from H.G. Bryce to R.M. Adams re: Ecological Aspects of Fluorosurfactants, Sept. 13, 1971, *available at* https://www. ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf (last accessed June 27, 2022). Hence, 3M understood at the very least that the fluorosurfactants used in its AFFF products would, in essence, never degrade once released into the environment.

125.    By the mid-1970s, 3M and Ansul (and possibly other Defendants) had an intimate understanding of the persistent nature of PFCs. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFAS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated." Technical Report Summary, August 12, 1976, *available at* https://www.ag. state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf (last accessed July 27, 2022).

126.    In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality. Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, La Crosse, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/ u2/a050508.pdf (last accessed July 27, 2022). Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristics … improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have reduced impact on the environment without loss of fire suppression effectiveness." *Id*. Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be

reduced, yet, upon information and belief, there is no evidence that Ansul (or any other Defendant) ever pursued initiatives to do so.

127.    A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFCs is "likely to persist in the environment for extended period unaltered by metabolic attack." Technical Report Summary re: Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons – II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf (last accessed July 27, 2022). A year later, a 3M study reported that one of its fluorosurfactants "was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink." Technical Report Summary re: Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons – III, July 19, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1179.pdf (last accessed July 27, 2022).

128.    In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978. Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state. mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf (last accessed June 27, 2022). More than a decade after 3M began selling AFFF containing fluorosurfactants, it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals." The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"

129.    During the 1970s, 3M also learned that the fluorosurfactants used in AFFF accumulated in the human body and were "even more toxic" than previously believed.

29

130.    In 1975, 3M learned that PFAS was present in the blood of the general population. Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf (last accessed June 27, 2022). Since PFAS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of the chemicals. The finding should have alerted 3M to the possibility that PFAS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain how the chemicals from 3M's products ended up in human blood.

131.    In 1976, 3M found PFAS in the blood of its workers at levels "up to 1,000 times 'normal' amounts of organically bound fluorine in their blood." 3M Chronology – Fluorocarbons in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1144.pdf (last accessed June 27, 2022). This finding should have alerted 3M to the same issues raised by the prior year's findings.

132.    In 1979, 3M and DuPont discussed 3M's discovery of PFAS in the blood of its workers and came to the same conclusion that there was "no reason" to notify the EPA of the finding. Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/ 3M/docs/PTX/PTX2723.pdf (last accessed June 27, 2022).

iv.    1980s and 1990s: Evidence of AFFF's Health Risks Continues to Mount

133.    By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain

30

cancers and other adverse health effects, including elevated river enzymes and birth defects, had been observed amount workers exposed such materials, including at least PFAS, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

134.    In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential and ecotoxicity of fluorochemicals in the environment." 3M Environmental Laboratory (EE & PC), Fate of Fluorocarbons – Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf (last accessed June 27, 2022). That same year, 3M completed a study finding that PFAS caused the growth of cancerous tumors in rats. Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state. mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf (last accessed June 27, 2022). This finding was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals." Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, Jan. 5, 1988, *available at* https://www.ag.state.mn.us/ Office/Cases/3M/docs/PTX/PTX1343.pdf (last accessed June 27, 2022).

135.    In 1984, 3M documented a trend of increasing levels of PFAS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo: "we must view the present trend with serious concern. It is certainly possible that… exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the

body." Memorandum from D.E. Roach to R.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf (last accessed June 37, 2022).

136. A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cites "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. Upon information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

v. Defendants Hid What They Knew from the Government and the Public

137. Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8€, 15 U.S.C. § 2607(e).

138. In April of 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for 244 violations of the TSCA, which included violations for failing to disclose studies regarding PFAS dating back decades.

139. Likewise, in December of 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFAS.

140. Upon information and belief, Defendants knew or should have known that AFFF containing PFAS would very likely injury and/or threaten public health and the environment, even when the products were used as intended or directed.

32

141.    Defendants failed to warn of these risks to the environment and public health, including the impact of their AFFF/Component Products on the quality of unprotected water sources.

142.    Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing AFFF/Component Products. They understood far more about the properties of these products – including the potential hazards they posed to human health and the environment – than members of the public. Still, Defendants declined to use this sophistication and knowledge to design safer products.

      **d.**        **The Impact of PFAS on the Environment and Human Health is Revealed**

143.    As discussed above, neither 3M, DuPont, nor, on information and belief, any other Defendant complied with their obligations to notify the EPA about the "substantial risk of injury to health or the environment" posed by their AFFF/Component Products. *See* TSCA § 8(e).

144.    Despite decades of research, 3M first shared its concerns with the EPA in the late 1990s. In May of 1998, in a report submitted to the EPA: "3M chose to report simply that PFAS had been found in the blood of animals, which is true but omits the most significant information," according to a former 3M employee. Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf (last accessed June 27, 2022).

145.    Upon information and belief, 3M began, in 2000, to phase out its production of PFAS-containing products in response to pressure from the EPA.

146.    Human health effects associated with PFAS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and

high cholesterol. In laboratory testing on animals, PFAS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

147.    The injuries caused by PFAS can arise months or years after exposure.

148.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

149.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFAS. *Revisions to the Unregulated Contaminant Monitoring Regulation (UMCR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

150.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFAS, called for greater regulation, restrictions, limits on the manufacture and handling of any PFAS-containing product and to develop non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment. Blum A., Balan S.A., Scheringer M., Trier X., Goldenman G., Cousins I.T., Diamond M., Fletcher T., Higgins C., Lindeman A.E., Peaslee G., de Voogt P., Wang Z., Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Eviron. Health

34

Perspect. 123:A107-A111; *available at* https://ehp.niehs.nih.gov/doi/pdf/10.1289/ehp.1509934 (last accessed June 27, 2022).

151. In 2022, the EPA released updated health advisory (HA) levels for PFAS, specifically PFOA and PFOS. Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS, *available at:* https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs (last accessed June 27, 2022). The EPA HAs identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.004 parts per trillion (PFOA) and 0.02 parts per trillion (PFOS). *Id.* The HAs are based on peer-reviewed studies of the effects of PFAS on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFAS. These studies indicate that exposure to PFAS over these levels may result in adverse health effect including:

a. Developmental effects to fetuses during pregnancy or to breast-fed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b. Cancer (testicular and kidney);

c. Liver effects (tissue damage);

d. Immune effects (e.g., antibody production and immunity);

e. Thyroid disease and other effects (e.g., cholesterol changes).

**e. Contamination Caused by Use of PFAS-Containing Products**

152. Through the continued use of PFAS-containing products over decades, the chemicals manufactured, distributed, and/or sold by the Defendants have traveled into the waterways on Plaintiff's Tribal Lands. PFAS have been detected in the surface water and ground water of Plaintiff's Tribal Lands.

153.    Plaintiff has incurred and will incur expenses to deal with the contaminated water and infrastructure modifications to ensure its Indian Lands contain clean and safe water and aquatic life. Plaintiff will incur future sampling and remediation costs for PFAS that have traveled through the waterways and into its soil and ground and surface water.

**COUNT I – RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961 et seq.**

154.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

155.    Defendants conducts their business through illegitimate means in an association-in-fact enterprise and/or legal entity enterprise.

156.    Defendants are persons under 18 U.S.C. § 1961(3) because they are entities holding a legal or beneficial interest in property.

157.    Defendants have aggressively sought to increase and generate profits from the PFC and AFFF markets by unlawfully withholding information from government agencies, including the EPA.

158.    Federal law requires the Defendants to notify the EPA if they have information that reasonably supports the conclusion that a substance or mixture presents a substantial risk of injury to health or the environment. Therefore, Defendants are not permitted to limitless expand the PFC and AFFF markets through increased sales of their PFAS-containing products.

159.    The precautionary measures created by the federal government and the EPA were intentionally established to reduce or eliminate the potential harm to the environment or health of the public.

160.    The Defendants found it impossible to maximize profits within the legal framework of the EPA.  Choosing illegal profits over law, Defendants systematically and

fraudulently violated their statutory duties of maintaining effective reporting measures through the intentional failure to inform of substantial risk of injury. As a result, Defendants illegally increased and continued production of their PFAS-containing products.

161.    The term "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals association in fact although not a legal entity." 18 U.S.C. § 1961(4). The definition of "enterprise" in § 1961(4) includes both legitimate and illegitimate enterprises.

162.    Defendants forged an association-in-fact enterprise to perpetuate their illegal scheme of continuing the manufacturing, distributing, marketing, and sales of PFAS-containing products without informing the EPA of potential substantial injury to health and to the environment that was known to the Defendants.  As a direct result of Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, Defendants were able to extract billions of dollars in profit, while Plaintiff suffered and is currently suffering from the contaminants put into the environment by the Defendants.

163.    At all relevant times.  Defendants operated as an enterprise formed for the purpose of unlawfully continuing and increasing sales of PFAS-containing products, allowing them to collectively benefit from increased profits.

164.    At all relevant times, the RICO Enterprise: (a) existed separately and distinctly from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Defendants; (d) characterized by interpersonal relationships among the Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit.  Each member of the RICO Enterprise participated in the

conduct of the enterprise, including patterns of racketeering activity, and shared in the astonishing growth of profits supplied by fraudulently inflating PFC and AFFF sales generated as a result of the RICO Enterprise's disregard for their duty to inform the EPA of potential substantial injury caused by those products.

165.    The RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across state lines, such as the manufacture, sale, distribution, and shipment of PFC and AFFF throughout the United States and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

166.    Plaintiff has injuries and damages that were directly caused by the Defendants' racketeering activities.

167.    Plaintiff seeks all legal and equitable relief as allowed by law, including actual damages, compensatory damages, equitable relief, punitive damages, exemplary damages, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest, as well as costs and damages for remediation and abatement of the PFAS chemicals.

## COUNT II – NEGLIGENCE

168.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

169.    This cause of action is brought pursuant to Florida law.

170.    Defendants failed to employ reasonable care which a reasonably prudent person should use under the circumstances by transporting, manufacturing, using, utilizing, storing,

handling, and/or disposing of toxic substances, specifically PFAS, in a way permitting its release into the soil, groundwater and other bodies of water.

171. The contamination of the water and aquatic life and its impact on Plaintiff's Indian Lands was a foreseeable consequence of Defendants' actions.

172. Defendants owed Plaintiff a cognizable duty to exercise reasonable care in transporting, testing, manufacturing, using, utilizing, storing, handling, environmental release and/or disposing of toxic substances, specifically PFAS.

173. Upon learning of the release of toxic substances, including but not limited to PFAS, Defendants owed Plaintiff a duty to act reasonably to remediate, contain, and eliminate the release before it reached and contaminated Plaintiff's water supply, as well as warn buyers, consumers and residents of the toxicity of the PFAS.

174. Defendants breached their duty by failing to act reasonably in the transporting, testing, manufacturing, using, utilizing, storing, handling and/or disposing of toxic substances, specifically PFAS, and failing to warn anyone of the toxicity and dangers.

175. Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, or remedy a release of PFAS after it occurred, as well as failing to warn anyone of the toxicity and dangers of PFAS.

176. Defendants negligently breached their duties to Plaintiff to ensure that their transporting, testing, manufacturing, using, utilizing, storing, handling, and/or disposing of PFAS was carried out in a safe and sufficiently secure manner as to prevent the release of PFAS into the environment surrounding their facilities and, consequently, Plaintiff's Indian lands.

177.    Defendants' breach of their duties was the direct, sole, and/or proximate or arbitrary  cause of Plaintiff's damages as alleged herein and imminent, substantial, and impending harm to Plaintiff.

178.    Defendants knew it was substantially certain that their acts or omissions described above would cause injury and damage, including PFAS contamination of the Tribe's Indian Lands.  Defendants committed each of the above-described acts or omissions knowingly, willfully and with oppression, fraud and/or malice.  Such conduct was performed to promote the sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the public health and welfare.  Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

179.    Defendants negligence was grossly negligent, willful, wanton, and/or in reckless disregard of the Plaintiff's rights, such that punitive damages should be awarded.

180.    Plaintiff seeks compensatory damages and punitive damages in a sum determined by a jury, as well as costs and damages for remediation and abatement of the PFAS chemicals.

### COUNT III – PUBLIC NUISANCE

181.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

182.    This cause of action is brought pursuant to Florida law.

183.    Because Plaintiff is a sovereign entity, its lands and natural resources are public and commonly held resources for the benefit of its citizens.  Members of the Tribe have a right to have their Tribal Lands' natural resources free of Defendants' toxic contamination.

184. Defendants' reckless, intentional, and unreasonable, abnormally dangerous, and/or negligent acts and omissions, as alleged above, resulted in the discharge of PFAS in the environment.

185. The discharge of PFAS in the environment resulted in the contamination of bodies of water on Plaintiff's Indian Lands with hazardous levels of PFAS.

186. The contamination has prevented and continues to prevent Plaintiff from safely consuming fish, having enough meals, and sharing knowledge based on cultural practices and constitutes a substantial interference with the Plaintiff's rights.

187. The inability to have safe-to-consume fish has caused the Plaintiff significant inconvenience and expense both financially and culturally.

188. By reason the forgoing, Defendants are liable to the Plaintiff for the damages it has suffered because of Defendants' actions, the amount of which will be determined at trial.

189. Consequently, Defendants substantially interfered with and caused damages to public or common resource that endanger Tribal property, as well as the health, safety and welfare of the Tribe's citizens. Defendants' acts and omissions create, contribute to or maintain a public nuisance.

190. Accordingly, Plaintiff seeks damages from Defendants directly resulting from its injuries in a sufficient amount to compensate for injuries and loss and to restore Plaintiff to its original position, including but not limited to, the difference in the value of the rights to Plaintiff's Indian Lands and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and direct, consequential, and nominal damages resulting from the nuisance and trespass which are the natural and proximate result of Defendants' conduct, as well as costs and damages for remediation and abatement of the

41

PFAS chemicals.

191.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of the Tribe's Tribal Lands.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud and/or malice.  Such conduct was performed to promote sales of fluorinated AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare.  Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

192.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

193.    Plaintiff prays for a judgment against the Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit.

## COUNT IV – PRIVATE NUISANCE

194.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

195.    This cause of action is brought pursuant to Florida law.

196.    Defendants' reckless, intentional, and unreasonable, abnormally dangerous, and/or negligent acts and omissions, as alleged above, resulted in the discharge of PFAS in the environment.

197.    The discharge of PFAS in the environment resulted in the contamination of bodies of water on Plaintiff's Indian Lands with hazardous levels of PFAS.

198. The contamination has prevented and continues to prevent Plaintiff from safely consuming fish, having enough meals, and sharing knowledge based on cultural practices and constitutes a substantial interference with the Plaintiff's rights.

199. The inability to have safe-to-consume fish has caused the Plaintiff significant inconvenience and expense both financially and culturally.

200. Defendants' intentional, negligent and/or reckless conduct has resulted in substantial and unreasonable interference with the Tribe's use and enjoyment of Tribal Lands, toxic PFAS contamination, causing injuries to the Tribe's economic, environmental, cultural and ecological interest.

201. Defendants' manufacture, distribution, sale, supply and marketing of fluorinated PFAS containing AFFF was unreasonable because Defendants had knowledge of PFAS unique and dangerous chemical properties and knew that contamination of municipal lands and natural resources was substantially certain to occur, but failed to provide adequate warning of, or take any precautionary measures to mitigate, those hazards.

202. The toxic PFAS contamination of the Tribe's Tribal Lands caused, contributed to and/or maintained by Defendants substantially and unreasonably interferes with Plaintiff's property rights and with the use and enjoyment of economic and natural resources.

203. Each Defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

204. Accordingly, Plaintiff seeks damages from Defendants directly resulting from its injuries in a sufficient amount to compensate for injuries and loss and to restore Plaintiff to its original position, including but not limited to, the difference in the value of the rights to Plaintiff's Indian Lands and such value if the harm had not been done, the cost of repair or

43

restoration, the value of the use of the continuous trespass, and direct, consequential, and nominal damages resulting from the nuisance and trespass which are the natural and proximate result of Defendants' conduct, as well as costs and damages for remediation and abatement of the PFAS chemicals.

205.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur economic damages related to toxic PFAS contamination of the Tribe's Tribal Lands, in an amount to be proven at trial.

206.    Defendants knew it was substantially certain that their acts or omissions described above would cause injury and damage, including PFAS contamination of the Tribe's Tribal Lands.  Defendants committed each of the above-described acts or omissions knowingly, willfully and with oppression, fraud and/or malice.  Such conduct was performed to promote the sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the public health and welfare.  Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

207.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

208.    Plaintiff prays for a judgment against the Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit.

### COUNT V – TRESPASS

209.    Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

210.    This cause of action is brought pursuant to the laws of Florida.

211.    Plaintiff Miccosukee Tribe of Indians of Florida resides on its Indian Lands and retains the right to fish, hunt and gather on its Indian Lands under various treaties with the United States.

212.    Plaintiff did not give any Defendant permission to cause PFAS to enter onto the Tribe's Tribal Lands.

213.    Defendants so negligently, recklessly, and/or intentionally failed to properly control, apply, use, and/or dispose of PFAS contaminants, such that they proximately caused and continue to cause said contaminants to contaminate Plaintiff's groundwater and resources.

214.    The contamination has varied over time and has not yet ceased.  PFAS continue to migrate into and enter Plaintiff's Indian Lands. The contamination is reasonably abatable.

215.    Plaintiff has not consented to, and does not consent to, this contamination.

216.    Defendants knew, or should have known, that the Plaintiff would not consent to this trespass onto the land and water it has rights to under its longstanding treaty.

217.    At the time the above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause PFAS be disbursed onto lands and into the lakes.

218.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused a large quantity of PFAS to be released into the water and aquatic life for the Plaintiff.

219.    Defendants' willful, wanton, and intentional failure to act and/or their affirmative choices of actions and following courses of actions have caused PFAS to enter and trespass upon the land the Plaintiff has rights to and cause injury to those rights.

220. Additionally, and/or alternatively, Defendants' decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the PFAS exposure and contamination after having knowledge and notice of said contamination were done with actual malice, and in wanton, willful, and/or reckless disregard for the rights, health, and property of the Plaintiff.

221. Defendants, their agents, and their employees knew, or should have known, that their PFAS chemicals are extremely hazardous to groundwater, lakes, and aquatic life within the Tribe's Indian Lands, including the property and other rights of the Plaintiff.

222. Defendants knew or should have known that PFAS have a propensity to infiltrate soils, sediments biota and other vital natural resources when released into the environment; PFAS are mobile and persistent compounds capable of moving substantial distances through aquifers, soil and sediments; PFAS compounds are toxic to human and animal health and PFAS compounds are therefore hazardous to public health and welfare and likely to cause ecological and economic injuries when released into the environment.

223. Defendants manufactured, promoted, marketed, distributed, and/or sold AFFF containing PFAS, which Defendants knew or reasonably should have known would certainly be discharged and release toxic PFAS into the ground and intrude upon, contaminate, and damage the Tribe's property rights and possessory interest.

224. Defendants' willful and intentional conduct directly resulted in the placement of their product, AFFF, on the Tribe's Tribal Lands without permission or right of entry.

225. Each Defendant is a substantial factor in bringing about the contamination of the Tribe's Tribal Lands, and each Defendant aided and abetted the trespasses and is jointly and severally liable for the injuries and damages caused to the Plaintiff.

46

226.    As a direct and proximate result of Defendant's acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur economic damages related to toxic PFAS contamination of the Tribe and Tribal Lands in an amount to be proven at trial.

227.    Accordingly, the Plaintiff seeks general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate it for the injuries and losses and to restore Plaintiff to its original position, including but not limited to the repair and restoration of the property and such has not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential and nominal damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in an amount to be proved at trial, as well as costs and damages for remediation and abatement of the PFAS chemicals.

228.    Defendants knew it was substantially certain that their acts or omissions described above would cause injury and damage, including PFAS contamination of the Tribe's Tribal Lands.  Defendants committed each of the above-described acts or omissions knowingly, willfully and with oppression, fraud and/or malice. Such conduct was performed to promote the sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the public health and welfare.  Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

229.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

230.    Plaintiff prays for a judgment against the Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit.

### COUNT VI – STRICT LIABILITY:  DEFECTIVE DESIGN

231.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

232.    Defendant's AFFF was defective in design or formulation in a manner that rendered the products unreasonably dangerous to purchasers and end users of AFFF, and were defective and dangerous at the time Defendants parted possession with the AFFF.

233.    As commercial designers, manufactures, distributors, suppliers, sellers and or marketers of AFFF containing PFAS, Defendants has a strict duty not to place into the stream of commerce a product that is defective or unreasonably dangerous.

234.    Defendants knew that third parties would purchase AFFF containing PFAS and use it without inspection for defects.

235.    At the time of manufacture, Defendants knew that the chosen formulation of AFFF was not biodegradable and bioaccumulated in property, fish, wildlife and humans.

236.    AFFF containing PFAS purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto the Tribe's Tribal Lands at various locations over time and in various amounts.

237.    The AFFF containing PFAS purchased by third parties was used in a foreseeable manner and without substantial change in the condition of such products.

238.    Defendants knew, or reasonably should have known, that the use of AFFF containing PFAS in its intended manner would foreseeably result in the spillage, discharge, disposal, or release of AFFF onto the Tribe's Tribal Lands.

239.    The AFFF containing PFAS released onto the Plaintiff's property was defective in design and unreasonably dangerous because, among other things PFAS have a propensity to infiltrate soils, sediments, biota and other vital natural resources when released into the environment; PFAS are mobile and persistent compounds capable of moving substantial distances through aquifers, soil and sediments; PFAS compounds are toxic to human and animal health and PFAS compounds are therefore hazardous to public health and welfare and likely to cause ecological and economic injuries when released into the environment.

240.    Defendants manufactured, promoted, marketed, distributed, and/or sold AFFF containing PFAS, which Defendants knew or reasonably should have known would certainly be discharged and release toxic PFAS into the ground and intrude upon, contaminate, and damage the Tribe's property rights and possessory interest.

241.    Defendants' willful conduct directly resulted in the placement of its product, AFFF, on the Tribe's Tribal Lands without permission or right of entry.

242.    Each Defendant is a substantial factor in bringing about the contamination of the Tribe's Tribal Lands; and each Defendant aided and abetted the trespasses and is jointly and severally liable for the injuries and damages caused to the Plaintiff.

243.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur economic damages related to toxic PFAS contamination of the Tribe's Tribal Lands in an amount to be proven at trial.

244.    Defendants knew it was substantially certain that their acts or omissions described above would cause injury and damage, including PFAS contamination of the Tribe's Tribal Lands.  Defendants committed each of the above-described acts or omissions knowingly, willfully and with oppression, fraud and/or malice.  Such conduct was performed to promote the sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the public health and welfare.  Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

245.    Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

246.    Plaintiff prays for a judgment against the Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit.

## COUNT VII – STRICT LIABILITY:  DEFECTIVE PRODUCT

247.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

248.    This cause of action is brought pursuant to the laws of Florida.

249.    Defendant's AFFF was defective in design or formulation in a manner that rendered the products unreasonably dangerous to purchasers and end users of AFFF at the time Defendants parted possession with the AFFF.

250.    As commercial designers, manufactures, distributors, suppliers, sellers and or marketers of AFFF containing PFAS, Defendants have a strict duty not to place into the stream of commerce a product that is defective or unreasonably dangerous.

50

251. Defendants knew that third parties would purchase AFFF containing PFAS and use it without inspection for defects.

252. At the time of manufacture, Defendants knew that the chosen formulation of AFFF was not biodegradable and bioaccumulated in property, fish, wildlife and humans.

253. AFFF containing PFAS purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto the Tribe's Tribal Lands at various locations over time and in various amounts.

254. The AFFF containing PFAS purchased by third parties was used in a foreseeable manner and without substantial change in the condition of such products.

255. The Defendants' manufacture, use, mishandling, and disposal of material and products that contained PFAS was inappropriate, given PFAS's toxicity and danger to human health and the proximity of the Tribe's Indian Lands to the sources of drinking water.

256. As a result, Defendants allowed or caused these ultrahazardous and abnormally dangerous substances to leach into the land and groundwater within the Tribe's Indian Lands, including the water supply relied on by Plaintiff.

257. Further, Defendants' contamination of the water supply and aquatic life with PFAS created the likelihood for personal injury and property damage to individuals who use and rely upon the water and the fisheries.

258. Defendants' manufacture, use, mishandling, and disposal of PFAS and their reckless disregard for the consequences of their actions caused the existence of a high degree of harm to both the Plaintiff and its property. Given the nature of PFAS, the likelihood of harm was great.

259.   The risk of such activities outweighs any value associated with the same.  As the result of the said ultrahazardous or abnormally dangerous activities, Plaintiff has suffered damages and imminent, substantial, and impeding harm to the health of its members, their families, to the value of Plaintiff's Indian Lands, the Tribe's longstanding cultural practices, and Plaintiff has expended and will continue expending significant resources to safeguard its property, obtain monitoring, testing, remediating services and equipment.

260.   Defendants knew, or reasonably should have known, that the use of AFFF containing  PFAS in its intended manner would foreseeably result in the spillage, discharge, disposal, or release of AFFF onto Tribe's Tribal Lands.

261.   The AFFF containing PFAS released onto the Plaintiff's property was defective in design and unreasonably dangerous because, among other things:  PFAS causes extensive and persistent contamination even when products containing it are used in their foreseeable and intended manner; PFAS contamination poses significant threats to public health and welfare; and Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or  adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

262.   At all times relevant to this action, AFFF containing PFAS was dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

263.   Defendants knew or should have known about feasible alternatives to producing AFFF without the use of PFAS, and the omission of such alternative designs rendered AFFF not reasonably safe.

264. As a direct and proximate result of the defects previously described, Tribe's Tribal Lands have been, and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiff significant injury and damage.

265. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its Tribal Lands.

266. Defendants knew it was substantially certain that their acts or omissions described above would cause injury and damage, including PFAS contamination of the Tribe's Tribal Lands. Defendants committed each of the above-described acts or omissions knowingly, willfully and with oppression, fraud and/or malice. Such conduct was performed to promote the sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

267. Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

268. Plaintiff prays for a judgment against the Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit.

## COUNT VIII – STRICT LIABILITY:  FAILURE TO WARN

269. Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

270. This cause of action is brought pursuant to the laws of Florida.

271.    As commercial distributors, sellers, manufacturers, suppliers, marketers and/or designers of AFFF, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of the product that Defendants knew or should have known about.

272.    At the time of marketing, when the AFFF left control of the Defendants, Defendants knew, or in the exercise of reasonable care, should have known that the AFFF was not biodegradable, and that it bioaccumulated in fish, wildlife and humans, and knew they were providing an inadequate warning or instruction about the inherent danger of allowing the AFFF to be released into the environment.

273.    Defendants knew that third parties would purchase AFFF containing PFAS and expect that it was biodegradable and use it at fire training facilities and during live fire operations where runoff would permeate the Tribe's Tribal Lands and natural resources.

274.    AFFF containing PFAS purchased or otherwise acquired (directly or indirectly) from Defendants by third parties was applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the Tribe's Tribal Lands.

275.    The AFFF containing PFAS purchased by third parties was used in a reasonably foreseeable manner and without substantial change in the condition of such products.

276.    Defendants knew or should have known that the use of AFFF containing PFAS in its intended manner would result in the discharge, disposal, or release of PFAS onto the Tribe's Tribal Lands.

277.    The AFFF containing PFAS used in the vicinity of the Tribe's Tribal Lands was defective in design and unreasonably dangerous for the reasons set forth above.

278. Despite the known and/or reasonably foreseeable hazards to property and human health and welfare associated with the use of AFFF containing PFAS, the Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

279. In particular, the Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their AFFF products containing PFAS.

280. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur substantial economic and environmental damages related to PFAS contamination in an amount to be proved at trial.

281. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of Plaintiff's land.

282. Defendants failed to warn buyers, users, and the public of the dangers of AFFF / Component Products contaminated with PFAS, as well as the inevitable spread of these toxins throughout groundwater, surface water, aquatic life, mammals and/or humans.

283. Plaintiff seeks compensatory damages and punitive damages in a sum determined by a jury, as well as costs and damages for remediation and abatement of the PFAS chemicals.

284. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests

an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

285. Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

286. Plaintiff prays for a judgment against the Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit.

## COUNT IX – FRAUDULENT TRANSFER
### (DuPont and Chemours Co.)

287. Plaintiff hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs as if fully restated herein.

288. Through the effectuation of the Spinoff, Chemours Co. and DuPont caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

289. The Transfers and Assumed Liabilities were made for the benefit of DuPont.

290. At the time that the Transfers were made, and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

291. DuPont and Chemours Co. made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

292. Plaintiff has been harmed because of the conduct of DuPont and Chemours Co.

293.    Plaintiff is entitled to avoid the Transfers and recover property or value transferred to DuPont.

## COUNT X – FRAUDULENT CONCEALMENT

294.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

295.    Throughout the relevant time period, Defendants knew that their products were defective and unreasonably unsafe for their intended purpose.

296.    Defendants fraudulently concealed from and/or failed to disclose to or warn the Plaintiff, and the public that their products were defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality.

297.    Defendants were under a duty to the Plaintiff and the public to disclose and warn of the defective and harmful nature of the products because:  Defendants were in a superior position to know the true quality, safety and efficacy of the Defendants' products; Defendants knowingly made false claims about the safety and quality of the Defendants' product in documents and marketing materials and Defendants fraudulently and affirmatively concealed the defective nature of the Defendants' products from the Plaintiff.

298.    The facts concealed and/or not disclosed by Defendants to the Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Defendants' products.

299.    Defendants intentionally concealed and/or failed to disclose the true defective nature of the products so that the Plaintiff would use the Defendants' products, the Plaintiff justifiably acted or relied upon, to Plaintiff's detriment, the concealed and/or non-disclosed facts as evidenced by Plaintiff's use of the Defendants' products.

300. Defendants, by concealment or other action, intentionally prevented the Plaintiff from acquiring material information regarding the lack of safety and effectiveness of the Defendants' products and are subject to the same liability to the Plaintiff for Plaintiff's pecuniary losses, as though Defendants had stated the non-existence of such material information regarding the Defendants' products' lack of safety and effectiveness and dangers and defects, and as though Defendants had affirmatively stated the non-existence of such matters that the Plaintiff was thus prevented from discovering the truth. Defendants therefore have liability for fraudulent concealment under all applicable laws, including, inter alia, Restatement (Second) of Torts §550 (1977).

301. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur substantial economic and environmental damages related to PFAS contamination in an amount to be proved at trial.

302. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of Plaintiff's land.

303. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

304. Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below

305.    Plaintiff prays for a judgment against the Defendants for actual, compensatory, consequential, and punitive damages, together with the costs of this action, and for such other and further relief as this Court may deem fit.

## COUNT XI – WANTONESS / PUNITIVE DAMAGES

306.    Plaintiff hereby repeats, realleges, and reiterates each allegation in the preceding paragraphs as if fully restated herein.

307.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and/or reckless conduct that caused the foregoing injuries, property damage, nuisances, and trespasses upon the persons and properties of Plaintiff, disregarding its protected rights.

308.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measure to ensure PFAS containing materials would be effectively disposed of and not discharged into the surrounding environment and groundwater supplies.

309.    Defendants have caused great harm to the property and natural resources of the Tribe.  Defendants have not only threatened and harmed the Tribe's property, natural resources, and food supply, but have also interfered with the Treaty rights granted to the Tribe with respect to hunting, fishing, and gathering. Defendants have demonstrated an outrageous conscious disregard for the safety of the Tribe with implied malice, warranting the imposition of punitive damages.

310.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the public health and welfare of the Tribe.  Therefore, Plaintiff requests an award of punitive

59

damages in an amount enough to punish the Defendants and that fairly reflects the aggravating circumstances alleged herein.

311.    Defendants are strictly, jointly, and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other reliefs set forth below.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

312.    Plaintiff had no way of knowing about the risk of property damage associated with the use of and exposure to AFFF until very recently.

313.    Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF is harmful to property and can cause widespread contamination.

314.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with use of and exposure to AFFF; nor would a reasonable and diligent investigation by Plaintiff have disclosed that AFFF could cause property damage.

315.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment Tolling

316.    All applicable statute of limitations have also been tolled by Defendants knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

317.    Instead of disclosing critical information regarding AFFF, Defendants have consistently and falsely represented that their AFFF products do not contaminate the environment.

318. This fraudulent concealment continues through present day.

319. Due to this fraudulent concealment, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

320. Defendants were under a continuous duty to consumer, end users, and other persons coming into contact with their products, including Plaintiff, to accurately provide safety information concerning its products and the risk associated with the use of and exposure to AFFF.

321. Instead, Defendants knowingly, affirmatively, and actively concealed information concerning AFFF and the serious risks associated with the use of AFFF.

322. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiff, as to each and every count herein, demands judgment against Defendants, and each of them, individually, jointly, and severally, and request the following relief:

    a.    A jury trial and finding or declaration that Defendants engaged in tortious conduct, including negligence, strict liability for ultrahazardous activity, racketeering, trespass, nuisance, fraudulent transfer, and/or willful, wanton, and careless disregard for the health, safety, property, and culturally significant values of Plaintiff;

    b.    An award to Plaintiff for damages, general, compensatory, consequential, and incidental;

    c.    An order for an award of attorney fees and costs, as provided by law;

    d.    An award of pre-judgment and post-judgment interest as provided by law;

    e.    Equitable or injunctive relief;

    f.    Compensatory damages according to proof including, but not limited to:

     i.       Costs associated with the remediation or abatement of PFAS chemicals in Tribal ground  and surface water;

     ii.      Costs associated with treating drinking water contaminated with PFAS;

     iii.     Costs associated with soil remediation of PFAS;

     iv.     Costs associated with restoration of Tribal fisheries;

     v.      Diminution of property value caused by PFAS contamination;

     vi.     Damages to the Tribe's culture caused by PFAS contamination;

     vii.    Medical monitoring of tribal members for injuries associated with PFAS exposure and

     viii.   Treble damages.

g.    An order barring transfer of DuPont's liabilities for the claims brought in this Complaint.

h.    An award of punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future; and

i.    An order for all such other relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues in the matter.

Dated: This the <u>29th</u> day of October, 2025       Respectfully submitted,

*/s/ T. Roe Frazer II*
T. Roe Frazer II
Thomas R. Frazer III
John Michael Allen
J. Grant LaBar
Jacob A. Schmidt
R. Prescott Sifton, Jr.
**Frazer PLC**
30 Burton Hills Boulevard, Suite 450
Nashville, TN 37215
Tel: (615) 647-6464
Fax:  (615) 307-4902
Roe@frazer.law
Trey@frazer.law

Grant@frazer.law
Mac@frazer.law
Jacob@frazer.law
Scott@frazer.law